**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**LAURA CONOVER,** *in her official capacity as Pima County Attorney*
32 N. Stone Ave.,
Tucson, AZ 85701

**MARY MORIARTY,** *in her official capacity as Hennepin County Attorney*
300 South 6th St., A-1200
Minneapolis, MN 55487

*Plaintiffs*,

v.

**FINANCIAL CRIMES ENFORCEMENT NETWORK**;
2070 Chain Bridge Rd., Suite 200
Vienna, VA 22182

**UNITED STATES DEPARTMENT OF THE TREASURY**;
1500 Pennsylvania Ave. NW
Washington, DC 20220

**SCOTT BESSENT**, *in his official capacity as Secretary of the Treasury Department*;
1500 Pennsylvania Ave. NW
Washington, DC 20220

**MARKWAYNE MULLIN**, *in his official capacity as Secretary of the Department of Homeland Security*; and
2707 Martin Luther King Jr. Ave. SE
Washington, DC 20528

**TODD BLANCHE**, *in his official capacity as Attorney General*
950 Pennsylvania Ave. NW
Washington, DC 20530

*Defendants*.

Case No. ________________

**COMPLAINT**

1. In 2021, Congress enacted the Corporate Transparency Act ("CTA") with broad bipartisan support to close a dangerous loophole in federal anti-money laundering and counter-

terrorism safeguards: the total absence of reliable ownership information for tens of millions of corporate entities formed or registered to do business in the United States.

2. Prior to the passage of the CTA, human traffickers, drug smugglers, money launderers, foreign agents, and white-collar criminals could create shell companies in the United States to facilitate their illicit activity without disclosing *any* information about who owned or controlled their companies. This lack of transparency stymied investigations, impeded efforts to trace and recover illicit proceeds, and made it difficult for federal, state, and local law enforcement to identify and prosecute criminals.

3. The CTA addressed this loophole by requiring companies created or registered to do business in the U.S. to disclose the identities of the people who actually own and control the company—called "beneficial ownership information." Beneficial ownership information is enormously useful to law enforcement agencies that investigate criminal activity involving shell companies.

4. In August of 2026, Defendants unlawfully attempted to gut the law. Contrary to the clear statutory scheme Congress enacted, the Financial Crimes Enforcement Network ("FinCEN"), a bureau of the Treasury Department, promulgated a revised regulation that purports to exempt *all* domestic companies from reporting *any* beneficial ownership information, and to exempt foreign companies from reporting *any* U.S. persons who are their beneficial owners.

5. These exemptions plainly contravene the CTA's text and stated purpose: Congress expressly subjected both domestic and foreign entities to beneficial ownership reporting requirements, while exempting only narrow categories of entities that pose a low risk of exploitation by criminals.

6. FinCEN's broad new exemptions rely on unfounded conclusions by certain Defendants—the Secretary of the Treasury, the Secretary of Homeland Security, and the

Attorney General—that such information is not "highly useful" to law enforcement and does not otherwise serve the public interest.

7. By FinCEN's own estimation, Defendants have exempted over 99% of the entities previously mandated to report beneficial ownership information under the CTA. Incredibly, Defendants also plan to permanently delete over 15 million beneficial ownership reports that FinCEN has already collected—making it easier than ever for criminals to use shell and front companies for illicit activities and evade detection by federal, state, and local law enforcement.

8. Defendants' illegal actions harm Plaintiffs, the head prosecutors for Pima County, Arizona, and Hennepin County, Minnesota. These offices regularly investigate and prosecute a variety of fraud and white-collar crime involving domestic shell companies. The CTA explicitly grants local prosecutors like Plaintiffs access to the beneficial ownership information collected by FinCEN, which is otherwise more difficult—and sometimes impossible—for local investigators to uncover.

9. Plaintiffs and their constituents are harmed by Defendants' decision to stop collecting data from all domestic entities, which inevitably includes entities used by criminals to facilitate illegal activity in Plaintiffs' jurisdictions. Plaintiffs are additionally harmed by Defendants' planned deletion of the data they have already collected, which would be useful to Plaintiffs' investigative activities.

10. Defendants' actions circumvent the express text, structure, and purpose of the CTA and flagrantly disregard the Administrative Procedure Act's procedural and substantive safeguards. To prevent trafficking, money laundering, and white-collar crime, Plaintiffs bring this case to compel Defendants to follow the law.

## PARTIES

11. Plaintiff Laura Conover is the elected head of the Pima County Attorney's Office, and brings this case in her official capacity. The Pima County Attorney's Office is the primary agency responsible for prosecuting crimes committed in Pima County, Arizona.

12. Plaintiff Mary Moriarty is the elected head of the Hennepin County Attorney's Office, and brings this case in her official capacity. The Hennepin County Attorney's Office is the primary agency responsible for prosecuting crimes committed in Hennepin County, Minnesota.

13. Plaintiffs' offices are entitled to beneficial ownership information with appropriate authorization under 31 U.S.C. § 5336(c)(2)(B) and are engaged in law enforcement activities under 31 C.F.R. § 1010.955(b)(2)(ii).

14. Defendant the United States Department of the Treasury ("Treasury Department") is a cabinet agency within the executive branch of the United States government. 31 U.S.C. § 301. Defendant FinCEN is a bureau within the Treasury Department. Treasury Order 105-08 (1990).

15. Defendant Scott Bessent is the Secretary of the Treasury. He is sued in his official capacity. Together, Defendants Bessent, FinCEN, and the Treasury Department are the "Treasury Defendants."

16. Defendant Markwayne Mullin is the Secretary of the Department of Homeland Security. He is sued in his official capacity.

17. Defendant Todd Blanche is the Attorney General of the United States. He is sued in his official capacity.

## JURISDICTION AND VENUE

18. This Court has jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under federal law, and the Court may grant declaratory and other appropriate relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. § 701 *et seq.*

19. Venue is proper in this District under 28 U.S.C. § 1391(e). Defendants are officers of the United States sued in their official capacities and agencies headquartered in this District, and a substantial part of the events giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### I. Lack of beneficial ownership transparency in the United States.

20. For decades, there were no comprehensive requirements in the United States forcing companies to disclose their actual beneficial ownership information, or "BOI." Ownership-disclosure requirements vary from state to state, and some states permit companies to form without disclosing any information about their owners.

21. The lack of disclosure requirements poses a significant threat to national security and public safety. For example:

a. In 2010, a congressional investigation discovered that the U.S. Department of Defense had entered into contracts totaling $2.16 billion with trucking companies that were part of a complex web of front and shell companies owned by individuals associated with the Taliban. Because of the lack of ownership transparency, the United States government unwittingly funneled taxpayer funds to a terrorist organization;

b. Russian arms trafficker Viktor Bout was able to sell millions of dollars' worth of weapons and explosives to the Colombian guerilla group known as "FARC" using companies registered in Delaware, Florida, and Texas;

c. Using a state-owned financial institution registered in the United States, the Iranian government acquired a $500 million skyscraper without initial detection, as well as several other pieces of real estate, and profited from the revenues generated by the properties;

d. A former Venezuelan national treasurer, Alejandro Andrade Cedeño, received over $1 billion in bribes that exploited his position with the Venezuelan Treasury. Using U.S. registered shell companies, Andrade was able to funnel corrupt funds and assets into the United States in violation of the Foreign Corrupt Practices Act; and

e. Chinese money laundering organizations ("CMLOs") used domestic shell companies to launder drug proceeds connected to cartels. In a recent example, three CMLO members were prosecuted following an operation used to launder nearly $100 million.[1]

22. The Financial Action Task Force ("FATF"), an independent, inter-governmental body that sets global standards for anti-money laundering and countering the financing of terrorism ("AML/CFT") programs, undertook several comprehensive evaluations of the United States's AML/CFT regime and repeatedly identified a fundamental gap: the United States had no comprehensive measures in place to ensure law enforcement had access to adequate, accurate, and timely BOI.[2]

---

[1] *Combating Illicit Financing By Anonymous Shell Companies Through The Collection Of Beneficial Ownership Information: Hrg., S. Comm. on Banking, Hous., & Urb. Affs.*, 116th Cong. 5 (2019) (testimony of Kenneth A. Blanco), *available at* https://www.banking.senate.gov/ imo/media/doc/Blanco%20Testimony%205-21-19.pdf.

[2] *See* FATF, *Anti-Money Laundering and Counter-Terrorist Financing Measures United States Mutual Evaluation Report* 4, 153–161 (2016), *available at* https://www.fatf-gafi.org/ media/fatf/documents/reports/mer4/MER-United-States-2016.pdf; FATF, *Third Mutual Evaluation Report on Anti-Money Laundering and Combating the Financing of Terrorism* 226–249 (June 23, 2006), *available at* https://www.fatf-gafi.org/content/dam/fatf-gafi/mer/MER%20US%20full.pdf.

23. Based on these and other revelations, numerous officials from the first Trump administration testified before Congress that requiring BOI reporting—and particularly such reporting for U.S. companies—would be invaluable for law enforcement. As examples:

a. **Treasury:** At a February 2018 hearing, then-Treasury Secretary Steven Mnuchin testified that "U.S. companies with hidden beneficial owners have been used by arms dealers, narco-traffickers, proliferators of weapons of mass destruction, and facilitators of massive health-care and mortgage frauds, among other abuses. . . . Treasury's ability to combat tax evasion and to detect, deter, and disrupt money laundering and terrorist financing would be greatly enhanced through reporting of beneficial ownership information at the time of company formation."[3]

b. **FinCEN:** In his written response to congressional questions for a November 2018 hearing, then-Director of FinCEN Kenneth Blanco identified the misuse of corporate structures, such as shell companies, by criminals as "a significant problem in the United States" and unequivocally urged Congress to adopt a "national framework for identifying beneficial ownership at the point of company formation" to "help protect the financial system from abuse."[4] According to Director Blanco, "beneficial ownership information is critical information not only to national security, but also to the investigations we do every day."[5]

---

[3] *President's Fiscal Year 2019 Budget: Hrg., S. Comm. on Fin.*, 115th Cong. 46 (2018), *available at* https://www.govinfo.gov/content/pkg/CHRG-115shrg35140/pdf/CHRG-115shrg35140.pdf.

[4] *Combating Money Laundering and Other Forms of Illicit Finance: Regulator and Law Enforcement Perspectives on Reform: Hrg., S. Comm. on Banking, Hous., & Urb. Affs.*, 115th Cong. 14 (2018), *available at* https://www.congress.gov/event/115th-congress/senate-event/LC68110/text.

[5] *Id.*

c. **Federal Bureau of Investigation ("FBI"):** In a June 2018 hearing, Dennis Lormel, former Chief of the FBI's Financial Crimes Program, explained that FATF had identified "serious gaps" in the U.S.'s AML/CFT system "that impede timely access to beneficial ownership information." Chief Lormel told Congress that "[w]ith the current threat environment, especially with the terrorism threat of homegrown violent extremists, law enforcement needs as much financial intelligence as is legally available. . . . I have been advocating for beneficial ownership legislation since 2012."[6]

d. **Department of Justice:** In his written response to congressional questions for his January 2019 confirmation hearing, William P. Barr, then-nominee to be Attorney General, agreed that "allowing law enforcement to obtain the identities of the beneficial owners of shell companies would help law enforcement to uncover and dismantle criminal networks," explaining that his "understanding is that when bad actors exploit front companies, shell companies, other legal structures, and nominees, this creates challenges for prosecutors and investigators seeking to identify the true owners of these entities."[7]

24. After building this extensive record, Representative Carolyn Maloney (D-NY) introduced the Corporate Transparency Act in May 2019. Senators Marco Rubio (R-FL) and

---

6 *Combating Money Laundering and Other Forms of Illicit Finance: How Criminal Organizations Launder Money and Innovative Techniques for Fighting Them: Hrg., Subcomm. on Nat'l Sec. & Int'l Trade & Fin. of the S. Comm. on Banking, Hous., & Urb. Affs.*, 115th Cong. 37 (2018), *available at* https://www.govinfo.gov/content/pkg/CHRG-115shrg33424/pdf/CHRG-115shrg33424.pdf.

7 *Confirmation Hearing on the Nomination of Hon. William Pelham Barr to be Attorney General of the United States: Hrg., S. Comm. on Judiciary*, 116th Cong. 716 (2019) (responses of William Barr to Questions for the Record), *available at* https://www.judiciary.senate.gov/imo/media/doc/Barr%20Responses%20to%20QFRs.pdf; *see also, e.g.*, *Corruption, Violent Extremism, Kleptocracy, and the Dangers of Failing Governance: Hrg., S. Comm. on Foreign Rels.*, 114th Cong. 5–13 (2016); *Keeping Foreign Corruption Out of the United States: Four Case Histories: Hrg., Permanent Subcomm. on Investigations, S. Comm. on Homeland Sec. & Gov't Affs.*, 111th Cong. (2010).

Ron Wyden (D-OR), along with Senator Sheldon Whitehouse (D-RI), introduced a companion bill in the Senate the following month that, with the House bill, ultimately became the CTA.

25. In support of the legislation, more than 100 former military officers, administration officials, law enforcement agents, and foreign policy experts sent a letter to the Senate urging Congress "to act against crime and corruption facilitated by anonymous ownership of U.S. shell companies."[8] Echoing the sentiments from congressional hearings, the coalition emphasized that "[t]he ability to control U.S. companies without disclosing beneficial ownership information has made them attractive vehicles for money laundering." The coalition urged Congress to "end[ ] anonymous ownership of companies" and "turn a vulnerability into an advantage, disrupting illicit financial networks and pushing back against adversaries who seek to undermine the rule of law globally."[9]

26. Throughout consideration of the bill, Congress made clear that it recognized the risks posed by lack of BOI reporting for U.S.-based entities and intended for the CTA to impose BOI reporting requirements on both foreign *and* domestic entities. In the Senate Finance Committee's press release on the Senate bill, Senator Whitehouse explained that:

> The United States has become a haven for shell corporations, allowing everyone from domestic criminals to foreign strongmen to obscure their ill-gotten gains in our financial system. It's common sense that law enforcement needs the ability to identify the actual owner of any American corporation, and that America should not be a financial haven for the world's worst people.[10]

27. In a December 2020 floor statement, Senator Sherrod Brown stated that the CTA "finally requires comprehensive reporting by U.S. companies of their actual owners—no

---

[8] Letter to Sen. Mitch McConnell and Sen. Chuck Schumer dated June 25, 2020, *available at* https://thefactcoalition.org/wp-content/uploads/2020/06/Anonymous-Companies-and-National-Security-Letter-June-25-2020-2.pdf.

[9] *Id.*

[10] U.S. Sen. Comm. on Finance, *Wyden, Rubio, Whitehouse Bill Would Combat Financial Crime by Ending Anonymous Shell Companies* (June 26, 2019), https://www.finance.senate.gov/ranking-members-news/wyden-rubio-whitehouse-bill-would-combat-financial-crime-by-ending-anonymous-shell-companies.

more hiding these abuses in anonymous shell companies. It cracks down on bankers who look the other way to actively aid money laundering and cracks down on Big Banks that have shoddy compliance systems."[11]

28. That same day, Senator Rubio posted on Twitter (now X) that "My 'Corporate Transparency Act,' the most significant anti-corruption & money laundering law in decades & which forces anonymous shell companies to disclose their true owners is going to pass as part of the end of year defense bill."[12]

29. The Corporate Transparency Act was ultimately enacted into law, over President Trump's veto, on January 1, 2021, as part of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388 (2021) ("NDAA").

## II. Overview and structure of the Corporate Transparency Act.

### A. Sense of Congress and Declaration of Purpose.

30. Section 6402 of the NDAA, titled "Sense of Congress," documents Congress's factual basis and legislative intent for requiring corporate entities, and specifically U.S.-based entities, to report beneficial ownership information under the CTA.

31. Congress explained that "more than 2,000,000 corporations and limited liability companies are being formed under the laws of the States each year;" but "most or all States do not require information about the beneficial owners of the corporations, limited liability companies, or other similar entities formed under the laws of the State[.]" NDAA §§ 6402(1), (2).

---

[11] 166 Cong. Rec. S7310 (daily ed. Dec. 9, 2020) (statement of Sen. Sherrod Brown), *available at* https://www.congress.gov/116/crec/2020/12/09/166/208/CREC-2020-12-09.pdf.

[12] @MarcoRubio, Twitter (Dec. 9, 2020), https://x.com/marcorubio/status/1336788799297302528.

32. Because "malign actors seek to conceal their ownership of corporations, limited liability companies, or other similar entities in the United States to facilitate illicit activity, including money laundering, the financing of terrorism, proliferation financing, serious tax fraud, human and drug trafficking, counterfeiting, piracy, securities fraud, financial fraud, and acts of foreign corruption, harming the national security interests of the United States and allies of the United States[,]" Congress concluded that:

> Federal legislation providing for the collection of beneficial ownership information for corporations, limited liability companies, or other similar entities formed under the laws of the States is needed to—
>
> (A) set a clear, Federal standard for incorporation practices;
>
> (B) protect vital United States national security interests;
>
> (C) protect interstate and foreign commerce;
>
> (D) better enable critical national security, intelligence, and law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity; and
>
> (E) bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards[.]

*Id.* §§ 6402(3), (5).

33. In 31 U.S.C. § 5311, Congress set out the purposes of the Bank Secrecy Act subchapter that incorporates the CTA, which include:

- Requiring "reports or records" that are "highly useful" in "(A) criminal, tax, or regulatory investigations, risk assessments, or proceedings; or (B) intelligence or counterintelligence activities";
- Facilitating "the tracking of money that has been sourced through criminal activity or is intended to promote criminal or terrorist activity"; and
- Establishing "appropriate frameworks for information sharing among . . . law enforcement authorities to identify, stop, and apprehend money launderers and those who finance terrorists."

31 U.S.C. §§ 5311(1), (3), (5).

B. Beneficial ownership information reporting requirements and exemptions.

34. To achieve the intent and purpose of the statute, the CTA requires every "reporting company" to report certain identifying information about its beneficial owners to FinCEN. 31 U.S.C. §§ 5336(b)(1)(A), (b)(2).

35. A "beneficial owner" is defined as an individual who, "directly or indirectly," either "exercises substantial control over the entity" or "owns or controls not less than 25 percent of the ownership interests of the entity[.]" *Id.* §§ 5336(a)(3)(A)(i), (ii).

36. The broad statutory definition of a "reporting company" encompasses any "corporation, limited liability company, or other similar entity" that is "(i) created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe" (*i.e.*, domestic companies), or "(ii) formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe" (*i.e.*, foreign companies). *Id.* § 5336(a)(11).

37. Congress explicitly exempted twenty-three categories of companies from the definition of "reporting company." *Id.* § 5336(a)(11)(B)(i)–(xxiii).

38. These statutory exemptions are based on Congress's assessment that such companies are unlikely to be involved in the type of illicit activity that the CTA was intended to identify, based on their structure or the degree to which they are already regulated. *See* Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59498, 59539 (Sept. 30, 2022) ("The CTA exempts from the definition of 'reporting company' twenty-three specific types of entities. Many of these exempt entities are already subject to substantial federal and/or

state regulation or already have to provide their beneficial ownership information to a governmental authority." (citation omitted)).[13]

39. For example, the exemptions include highly regulated entities that are subject to strict federal oversight and already required to disclose ownership information to federal regulators, such as banks and companies that have issued publicly traded securities. 31 U.S.C. § 5336(a)(11)(B)(i), (iii).

40. Large operating companies that meet specific thresholds for revenue and employees are also exempted, because such companies already have a significant, transparent physical and financial footprint in the United States that makes them a low risk for illicit activities like money laundering or anonymous shell-company abuse. 31 U.S.C. § 5336(a)(11)(B)(xxi).

41. The statute gives the Secretary limited authority to exempt additional "class[es] of entities" from reporting obligations if the Secretary, with the written concurrence of the Attorney General and the Secretary of Homeland Security ("DHS Secretary"), determines that collecting information from such entities: "(I) would not serve the public interest; and (II) would not be highly useful in national security, intelligence, and law enforcement agency efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, proliferation finance, serious tax fraud, or other crimes." *Id.* § 5336(a)(11)(B)(xxiv).

42. The statute plainly does not contemplate an exemption for *all* domestic companies from reporting requirements. In addition to explicitly defining "reporting company" to include domestic companies (*id.* § 5336(a)(11)(A)(i)), the statute provides a mechanism to

---

[13] In his December 2020 floor statement regarding the passage of the NDAA, Senator Brown explained, "[t]he basic justification behind the bill's exemptions is that each exempt category refers to entities that already disclose their beneficial owners to the government in one way or another . . . . Each of the exemptions should be interpreted as narrowly as possible to exclude entities that do not disclose their beneficial owners to the government." 166 Cong. Rec. S7311 (daily ed. Dec. 9, 2020) (statement of Sen. Sherrod Brown), *available at* https://www.congress.gov/116/crec/2020/12/09/166/208/CREC-2020-12-09.pdf.

inform domestic companies of their reporting requirements. Specifically, states and tribes are required to periodically "notify filers of their requirements as reporting companies" and "provide the filers with a copy of the reporting company form[.]" *Id.* § 5336(d)(2)(A)(i). The statute explicitly directs that such notification should be provided "at the time of any initial formation or registration of an entity, assessment of an annual fee, or renewal of any license to do business in the United States and in connection with State or Indian Tribe corporate tax assessments or renewals[.]" *Id.*

C. Data collection, retention, and information-sharing with state and local law enforcement agencies.

43. Under the statute, FinCEN is required to retain all reported BOI for at least 5 years after the date on which the reporting company terminates. 31 U.S.C. § 5336(c)(1).

44. Given the sensitivity of the reportable information, the CTA imposes strict confidentiality, security, and access restrictions on the data FinCEN collects. The statute directs FinCEN to store the reported beneficial ownership information in a secure, nonpublic database. *Id.* § 5336(c). FinCEN may only disclose the stored BOI to specific entities, including federal, state, and local law enforcement agencies, and for specific purposes, including national security, intelligence, and law enforcement. *Id.* § 5336(c)(2)(B)(i), (ii).

45. Specifically, upon request, FinCEN is authorized to disclose the BOI it collects to any "State, local, or Tribal law enforcement agency" if a court has authorized the agency to seek the information for a criminal or civil investigation. *Id.* § 5336(c)(2)(B).

46. "In promulgating the regulations required" for the collection of BOI, Congress directed the Treasury Secretary to:

> collect information . . . in a form and manner that ensures the information is highly useful in—(I) facilitating important national security, intelligence, and law enforcement activities; and (II) confirming beneficial ownership information provided to financial institutions to facilitate the compliance of the financial institutions with anti-money laundering, countering the financing of terrorism, and customer due diligence requirements under applicable law[.]

*Id.* § 5336(b)(1)(F)(iv).

47. While ensuring that the information collected is highly useful, the Secretary must "to the greatest extent practicable . . . minimize burdens on reporting companies associated with the collection" of BOI. 31 U.S.C. § 5336(b)(1)(F)(iii).

48. The statute further mandates that FinCEN "shall, to the greatest extent practicable—establish partnerships with State, local and Tribal governmental agencies" when promulgating the reporting regulations. *Id.* § 5336(b)(1)(F)(i).

49. Similarly, FinCEN must "to the greatest extent practicable, update the [BOI reported under] subsection (b) by working collaboratively with other relevant Federal, State, and Tribal agencies[,]" and federal, state, and tribal entities are directed to "cooperate with and provide information requested by FinCEN for purposes of maintaining an accurate, complete, and highly useful database for beneficial ownership information." *Id.* § 5336(d)(1), (d)(2).

## III. Regulatory implementation of the beneficial ownership information reporting requirements.

### A. The Reporting Rule.

50. After issuing an Advance Notice of Proposed Rulemaking ("ANPRM") and Notice of Proposed Rulemaking ("NPRM"), FinCEN issued the final rule implementing reporting requirements under the CTA (the "Reporting Rule") on September 30, 2022, addressing, among other things, "who must file; when they must file; and what information they must provide." Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59498, 59500 (Sept. 30, 2022) (codified at 31 C.F.R. Part 1010).

51. Relevant here, the Reporting Rule required BOI reporting by any non-exempt "domestic reporting company" as well as any non-exempt "foreign reporting company." 31 C.F.R. § 1010.380(a)(1)(i), (ii).

52. The Reporting Rule defined "domestic reporting company" as any corporation, LLC, or other entity "[c]reated by the filing of a document with a secretary of state or any similar office under the law of a State or Indian tribe." *Id.* § 1010.380(c)(1)(i).

53. The Reporting Rule defined "foreign reporting company" as any corporation, LLC, or other entity "[f]ormed under the law of a foreign country" and "[r]egistered to do business in any State or tribal jurisdiction by the filing of a document with a secretary of state or any similar office under the law of a State or Indian tribe." *Id.* § 1010.380(c)(1)(ii).

54. Consistent with the CTA, the Reporting Rule included the twenty-three statutory exemptions from the definition of "reporting company," and no additional exemptions. *Id.* § 1010.380(c)(2).

55. FinCEN estimated that under the Reporting Rule, there would be about 32,556,929 entities required to report BOI in 2024, and about 4,998,468 new entities per year would be required to report BOI thereafter. 87 Fed. Reg. at 59568.

56. FinCEN also explained that it was developing a Beneficial Ownership Secure System ("BOSS") to receive, store, and maintain BOI reported under the Reporting Rule, secured to a Federal Information Security Management Act "High" compliance level (the highest information security protection level under the Act), in order to "ensure that Treasury has taken all appropriate steps to safeguard BOI and to disclose BOI only for authorized purposes consistent with the CTA." 87 Fed. Reg. at 59508–09.[14]

B. <u>FinCEN's extensive explanation and reasoning for the Reporting Rule.</u>

57. "As required by the CTA," FinCEN designed the Reporting Rule regulations "to minimize the burden on reporting companies, particularly small businesses, and to ensure that the information collected is accurate, complete, and highly useful." 87 Fed. Reg. at 59500.

---

[14] FinCEN promulgated regulations regarding access to the BOSS database on December 22, 2023. Beneficial Ownership Information Access and Safeguards, 88 Fed. Reg. 88732 (Dec. 22, 2023) (codified at 31 C.F.R. Part 1010).

58. Incorporating findings from the ANPRM and NPRM, FinCEN relied on decades of empirical data, congressional testimony, and Treasury, national security, and law enforcement agency findings to establish that access to BOI reported under the Reporting Rule:

> would significantly aid efforts to protect the U.S. financial system from illicit use. It would impede illicit actors' ability to use legal entities to conceal proceeds from criminal acts that undermine U.S. national security and foreign policy interests . . . [and] provide essential information to the intelligence and national security professionals who work to prevent terrorists, proliferators, and those who seek to undermine our democratic institutions or threaten other core U.S. interests from raising, hiding, or moving money in the United States through anonymous shell or front companies.

*Id.* at 59500–01; *see also id.* at 59501–07.

59. FinCEN explicitly found that its historical inability to collect BOI from corporate entities in the United States "has been a vulnerability in the U.S. anti-money laundering/countering the financing of terrorism (AML/CFT) framework," and "makes the United States a jurisdiction of choice for those wishing to create shell companies that hide their ultimate beneficiaries." *Id.* at 59548, 59506.

60. Citing the Treasury Department's 2022 *National Money Laundering Risk Assessment*,[15] FinCEN explained:

> [T]here is currently no systematic way to obtain information on the beneficial owners of entities in the United States. The misuse of legal entities, both within the United States and abroad, remains a major money laundering vulnerability in the U.S. financial system. Within the United States, criminals have historically been able to take advantage of the lack of uniform laws and regulations pertaining to the disclosure of information detailing an entity's beneficial ownership. This has stemmed mainly from the different levels of information and transparency required by states at the time of a legal entity's registration.

*Id.* at 59579.

[15] U.S. Dep't of the Treasury, *National Money Laundering Risk Assessment* 35–36 (2022), *available at* https://home.treasury.gov/system/files/136/2022-National-Money-Laundering-Risk-Assessment.pdf.

61. Indeed, according to data from Global Financial Integrity, a policy organization focused on addressing illicit finance and corruption, "more public and anonymous corporations are created in the United States than in any other jurisdiction[.]" *Id.* at 59500.[16] The World Bank similarly assessed that "10 times more legal entities were formed in the United States than in all 41 tax haven jurisdictions combined." *Id.* at 59500 n.20.[17]

62. FinCEN gave numerous examples of criminal actors using U.S.-based corporate entities to obfuscate their illicit activities and highlighted specific examples of significant criminal investigations into the use of both foreign and domestic shell companies to launder money or evade sanctions imposed by the United States. *See, e.g.*, *id.* at 59498–99, 59503–04.

63. Relying on congressional testimony by law enforcement officials and other data, FinCEN explained that because existing law enforcement and regulatory tools are time- and resource-intensive and provide only limited BOI, they are not a sufficient alternative to BOI reporting under the Reporting Rule. *See, e.g.*, *id.* at 59502–05, 59533, 59558–59.

64. Pointing to the Treasury Department's 2018 and 2022 National Money Laundering Risk Assessments, 2018 and 2020 National Strategies for Combating Terrorist and Other Illicit Financing reports, and other data demonstrating the need for such information, FinCEN determined that the obligations set forth in the Reporting Rule would provide essential information to law enforcement and others to help prevent corrupt actors, terrorists, and proliferators from hiding money or other property in the United States. *See id.* at 59500–07.[18]

---

16 Citing Global Financial Integrity, *The Library Card Project: The Ease of Forming Anonymous Companies in the United States* (Mar. 2019), *available at* https://gfintegrity.org/report/the-library-card-project/.

17 Citing The World Bank, UNODC, Stolen Asset Recovery Initiative, *The Puppet Masters: How the Corrupt Use Legal Structures to Hide Stolen Assets and What to Do About It* 93 (2011), *available at* https://star.worldbank.org/sites/star/files/puppetmastersv1.pdf.

18 *See, e.g.*, U.S. Dep't of the Treasury, *National Strategy for Combating Terrorist and Other Illicit Financing* 13–14 (2022), *available at* https://home.treasury.gov/system/files/136/2022-National-Strategy-for-Combating-Terrorist-

65. FinCEN specifically considered objections to the reporting requirements from small businesses. *See id.* at 59498, 59500–01, 59509, 59512, 59519, 59522, 59524, 59538–39, 59546–52, 59554–55, 59557–58, 59561–62, 59569–70, 59574, 59576–77, 59583–86, 59588. FinCEN explicitly declined to exempt small businesses from reporting because "FinCEN believes that the definition of reporting company requires small businesses to report beneficial ownership information to FinCEN" and "such an exemption could result in no entities being subject to the rule." *Id.* at 59583.

66. Further, FinCEN found that BOI reporting had benefits for small businesses:

> The collection of BOI in a centralized database, accessible to U.S. Government departments and agencies, law enforcement, tax authorities, and financial institutions, may also help to level the playing field for honest businesses, including small businesses with fewer resources, that are at a disadvantage when competing against criminals who use shell companies to evade taxes, hide their illicit wealth, and defraud employees and customers.

*Id.* at 59501.

67. FinCEN estimated that it would cost the majority of reporting companies only $85.14 to prepare and submit an initial BOI report under the Reporting Rule. *Id.* at 59549.

68. FinCEN explicitly recognized that "[w]hile many legal entities are used for legitimate purposes, they can also be misused, as highlighted in the NPRM, and as Congress recognized in the CTA." *Id.* at 59509. In its effort "to comply with applicable statutory requirements" to both require BOI reporting and minimize the burden on reporting companies, "FinCEN has not required information beyond that which is essential to developing a useful,

---

and-Other-Illicit-Financing.pdf (finding "[t]he passage of the CTA was a critical step forward in closing a long-standing gap and strengthening the U.S. AML/CFT regime" and that "[a]ddressing the gap in [BOI] collection at the time of entity formation is the most important AML/CFT regulatory action for the U.S. government."); U.S. Dep't of the Treasury, *National Strategy for Combating Terrorist and Other Illicit Financing* 13–15 (2020), *available at* https://home.treasury.gov/system/files/136/National-Strategy-to-Counter-Illicit-Financev2.pdf (explicitly describing the vulnerability posed by the lack of BOI reporting for domestic companies).

secure database." *Id.* at 59550. FinCEN also described the numerous steps it took to minimize the economic impact of the Reporting Rule on small businesses. *Id.* at 59586–90.

69. In explaining why it declined to include any exemptions beyond the twenty-three specifically set out in the CTA, FinCEN explained that:

> [A]s a general matter, . . . it is appropriate to interpret ambiguities in [the CTA's] exemptions reasonably narrowly. The CTA's definition of 'reporting company' is broad, the exemptions for twenty-three specific categories of entities are carefully circumscribed, and the expansion of these exempt categories requires consultation and specific findings that BOI reporting would not be highly useful and serve the public interest. Those features of the CTA are consistent with its overall objective of enhancing financial transparency and making it more difficult for bad actors to conceal their illicit financial activities.

*Id.* at 59539–40.

70. Indeed, FinCEN explained that "the CTA reflects Congress's concern that exemptions could create loopholes that illicit actors could exploit to evade reporting requirements. The CTA therefore sets a high bar for creating additional exemptions[.]" *Id.* at 59540.

71. FinCEN further considered advice from the principal authors of the CTA in the Senate and U.S. House of Representatives, who wrote to FinCEN that:

> Effective and timely implementation of the new BOI reporting requirement will be a dramatic step forward, strengthening U.S. national security by making it more difficult for malign actors to exploit opaque legal structures to facilitate and profit from their bad acts . . . [To do this] means writing the rule *broadly* to include in the reporting as many corporate entities as possible while *narrowly* limiting the exemptions to the smallest possible set permitted by the law.

*Id.* at 59501.

72. FinCEN also conducted a rigorous Regulatory Impact Analysis, including detailed cost and benefit analyses, for the Reporting Rule. *See id.* at 59549–86. Numerous sources substantiated FinCEN's conclusion that:

> [T]he rule will have a significant positive impact and that the benefits justify the costs. The rule will likely improve investigations by law enforcement and assist other authorized users in a variety of activities. All of this should in turn strengthen national security, enhance financial system transparency and

> integrity, and align the U.S. financial system more thoroughly with international financial standards.

*Id.* at 59579–80.

C. Initial reporting deadlines and delay of implementation.

73. The Reporting Rule required domestic reporting companies created before January 1, 2024, and foreign reporting companies registered before January 1, 2024, to report their BOI by January 1, 2025. 87 Fed. Reg. at 59592; 31 C.F.R. § 1010.380(a)(1)(iii) (2022).

74. FinCEN estimated that about 32.6 million companies would need to file initial BOI reports. 87 Fed. Reg. at 59549.

75. For later-formed domestic entities and later-registered foreign reporting companies, the respective formation or registration triggered a 30-day reporting period, which FinCEN later extended to a 90-day period for reporting companies created or registered during 2024. *Id.* at 59591; 31 C.F.R. § 1010.380(a)(1)(i)–(ii) (2022); FinCEN, Beneficial Ownership Information Reporting Deadline Extension for Reporting Companies Created or Registered in 2024, 88 Fed. Reg. 83499 (Nov. 30, 2023).

76. FinCEN estimated that about 5 million additional companies would file BOI reports each year. 87 Fed. Reg. at 59549.

77. BOI reporting deadlines were temporarily stayed due to nationwide injunctions in pending litigation; however, as of February 18, 2025, no nationwide injunctions remained in effect. Beneficial Ownership Information Reporting Requirement Revision and Deadline Extension, 90 Fed. Reg. 13688, 13689–90 (Mar. 26, 2025).

## IV. FinCEN's reversal of the Reporting Rule and elimination of the BOI reporting system set forth in the CTA.

A. The Interim Final Rule.

78. Shortly after President Trump began his second term, Elon Musk—who at that point was leading the so-called "Department of Government Efficiency"—set his sights on the Reporting Rule.

79. In response to a conservative social media influencer's X post "begging" Musk to "[p]lease ask President Trump to get rid of this ridiculous [beneficial ownership information] rule that Biden Created. It's targeting conservatives and small businesses!" Musk commented that he would "look into" the BOI reporting requirements:[19]




80. The next day, on March 2, 2025, the Treasury Department announced that, as a part of the President's agenda, it would issue a proposed rule to narrow the scope of the BOI reporting rules so that they applied to foreign reporting companies only, a move that it identified as a "victory for common sense."[20]

---

[19] Elon Musk, @elonmusk, Twitter (Mar. 1, 2025), https://x.com/elonmusk/status/1896005328338371043; *see also* Clara Ence Morse, Eric Lau, Azi Paybarah and Talia Trackim, *Elon Musk gets government policy ideas from X. Here's how*, The Washington Post (Apr. 14, 2025), https://www.washingtonpost.com/politics/interactive/2025/elon-musk-x-posts-influencers-trump-policy/ [http://archive.today/9EkOv].

[20] U.S. Dep't of the Treasury, *Treasury Department Announces Suspension of Enforcement of Corporate Transparency Act Against U.S. Citizens and Domestic Reporting Companies* (Mar. 2, 2025), https://home.treasury.gov/news/press-releases/sb0038.

81. The same day, President Trump posted on Truth Social:[21]



**Donald J. Trump**
@realDonaldTrump

Exciting news! The Treasury Department has announced that they are suspending all enforcement of the outrageous and invasive Beneficial Ownership Information (BOI) reporting requirement for U.S. Citizens. This Biden rule has been an absolute disaster for Small Businesses Nationwide. Furthermore, Treasury is now finalizing an Emergency Regulation to formally suspend this rule for American businesses. The economic menace of BOI reporting will soon be no more.

82. On March 26, 2025, FinCEN issued an Interim Final Rule (the "IFR") formalizing the announcement. *See* Interim Final Rule, 90 Fed. Reg. at 13688, 13693.

83. FinCEN bypassed the notice-and-comment procedures required under 5 U.S.C. § 553, claiming that "the need to expeditiously exempt domestic reporting companies and U.S. persons who are beneficial owners of foreign reporting companies" satisfies the "good cause" exception in 5 U.S.C. § 553(b)(B). 90 Fed. Reg. at 13693.

84. The IFR provided for two primary exemptions from the original Reporting Rule's beneficial ownership information reporting requirements.

85. First, FinCEN exempted *all* entities previously defined as "domestic reporting companies" from all BOI reporting obligations. *Id.* at 13690. In other words, companies formed in the United States no longer had to report BOI under the IFR.

86. FinCEN cited its authority under 31 U.S.C. § 5336(a)(11)(B)(xxiv), which allows FinCEN to exempt "any entity or class of entities" that the Secretary of the Treasury, with the written concurrence of the DHS Secretary and the Attorney General, determines

---

[21] @RealDonaldTrump, Truth Social (Mar. 2, 2025), http://truthsocial.com/realDonaldTrump/posts/114096120067427782827.

"would not serve the public interest" *and* "would not be highly useful in national security, intelligence, and law enforcement agency efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, proliferation finance, serious tax fraud, or other crimes." 90 Fed. Reg. at 13690.

87. The IFR claimed that "the reporting of BOI by domestic reporting companies and their beneficial owners 'would not serve the public interest' and 'would not be highly useful in national security, intelligence, and law enforcement agency efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, proliferation finance, serious tax fraud, or other crimes.'" *Id.* at 13691. FinCEN admitted that it "did not conduct the kinds of robust quantitative analysis necessary to estimate the incremental value" of BOI. *Id.* at 13694.

88. To support this conclusion, FinCEN claimed, without any analysis, that "most domestic reporting companies that are not already covered by a statutory exemption are small businesses," and "[t]he vast majority of domestic small businesses are legitimate and owned by hard-working American taxpayers who are not engaged in illicit activity." *Id.* at 13691. Therefore, according to the IFR, exempting domestic companies from the reporting requirements "would ensure that the Reporting Rule is appropriately tailored to advance the public interest, considering the burdens imposed by the regulations without sufficient benefits." *Id.*

89. But the fact that most domestic companies are legitimate does not mean that BOI reporting is not "highly useful" to law enforcement. As FinCEN recognized when promulgating the original Reporting Rule, criminals use the same corporate forms as legitimate businesses, and the companies whose ownership information will later prove important to law enforcement cannot be identified in advance. *See* 87 Fed. Reg. at 59509.

90. As for the second exemption, FinCEN exempted foreign companies from the requirement to report any U.S. persons who are their beneficial owners. 90 Fed. Reg. at 13690.

91. For this exemption, FinCEN cited the Secretary's general authority under 31 U.S.C. § 5318(a)(7) of the overarching Bank Secrecy Act, which allows the Secretary to "prescribe an appropriate exemption from a requirement under this subchapter and regulations prescribed under this subchapter." 90 Fed. Reg. at 13690.

92. According to FinCEN, "[t]he Secretary has assessed that exempting U.S. persons' BOI would ensure that the Reporting Rule is appropriately tailored to advance the public interest, considering the burdens imposed by the regulations without sufficient benefits." 90 Fed. Reg. at 13691. It offered no additional detail for that assessment.

93. FinCEN further justified the exemption under the policy direction in Executive Order 14192, *Unleashing Prosperity Through Deregulation*, "to alleviate unnecessary regulatory burdens placed on the American people." *Id.* at 13692.

94. Overall, the only justification offered for the IFR's drastic departure from the reporting requirements under the Reporting Rule was a "reassessment" of the Reporting Rule as a result of the "change in presidential administrations." *Id.* at 13691.

95. According to FinCEN's own estimate, these temporary exemptions eliminated the BOI reporting requirement for over 99% of the entities that were previously required to report. *Id.* at 13695 n.51.[22]

B. The Reporting Rule Reversal.

96. On August 14, 2026, FinCEN issued a Final Rule titled "Beneficial Ownership Information Reporting Requirement Revision and Deadline Extension" (the "Reporting Rule Reversal") that makes the Interim Final Rule exemptions permanent, effectively repealing the CTA's reporting requirements altogether. Beneficial Ownership Information Reporting

[22] *See also* U.S. Gov't Accountability Office, GAO-26-107967, *CORPORATE TRANSPARENCY: Treasury Should Address Gaps in Ownership Information Resulting from Expanded Exemptions* 15, 30 (2026), https://www.gao.gov/assets/890/886366.pdf.

Requirement Revision and Deadline Extension, 91 Fed. Reg. 52508 (Aug. 14, 2026) (codified at 31 C.F.R. Part 1010).

97. According to the Treasury Department, the change in presidential administrations in 2025 "resulted in a reassessment of the balance struck in the original Reporting Rule between collecting information that is 'highly useful' for law enforcement and minimizing burdens on reporting companies." *Id.* at 52513. The Reporting Rule was "prepared under an evaluation framework that . . . Treasury now assesses to have been inadequately appreciative of business burden." *Id.*

98. The Reporting Rule Reversal simply reiterated the "benefit-to-burden ratio" reasoning set forth in the IFR for the domestic reporting company exemption. *See id.* at 52510–11, 52513–14, 52517. Based only "on a reasonable assumption that the great majority of small businesses are law-abiding and do not pose a risk of money laundering or illicit finance," FinCEN explained that "the Secretary has determined, and the Departments of Justice and Homeland Security have concurred in writing, that the original Reporting Rule's indiscriminate collection of BOI from [domestic] entities would not provide law enforcement with highly valuable information. Considering the costs of time and money that the BOI requirements would place on law-abiding American small businesses, Treasury concluded in the IFR, and continues to maintain, that requiring BOI reporting from these entities is not in the public interest." *Id.* at 52513.[23]

99. In response to comments expressing that domestic company BOI is critical for law enforcement investigations, FinCEN responded that it "recognizes that there are numerous, varied, and compelling reasons to support broad reporting of legal entity BOI. Treasury has, in the past, made the case for such a reporting requirement, appealing to many of the same law

---

[23] The Departments of Justice and Homeland Security provided their concurrences prior to the issuance of the Interim Final Rule. *See* 90 Fed. Reg. at 13691.

enforcement, national security, and international cooperation interests that commenters have cited. However, in issuing the IFR and this final rule, Treasury is required to consider the constraints imposed by the CTA in tailoring the scope of the BOI reporting requirements; in particular, the cost considerations must be balanced against other factors." *Id.* at 52514.

100. The CTA does not delegate authority to the Secretary to make sweeping exemptions to the reporting requirements based on "cost considerations."

101. With respect to the exemption for foreign company reporting of U.S. beneficial owners, FinCEN simply stated that the rule "aimed to relieve burden on individual U.S. persons as well as U.S. legal entities." *Id.* at 52517.

C. The Reporting Rule Reversal – Data Deletion Policy.

102. In the Reporting Rule Reversal, FinCEN also set forth a new policy (the "Data Deletion Policy") that it will delete all reports it has received from entities that are "reporting companies" under the statute but that have now been granted an exemption under the Reporting Rule Reversal—approximately 15 million reports. *Id.* at 52523.[24]

103. FinCEN justified this decision with a finding "that the values of privacy, information security, and the trust of the public all argue for the removal from the BO IT System, as much as practicable, of information that would not have been reported if the reporting requirements of this final rule had been in place starting on January 1, 2024." *Id.* at 52518.

104. Using the information previously submitted, FinCEN plans to "identify all domestic reporting companies, company applicants, and beneficial owners associated with domestic reporting companies" and work with the National Archives and Records Administration to implement a process "to delete information about any individuals—company

---

[24] At the time the IFR was issued, there were approximately 17.5 million outstanding reports. 91 Fed. Reg. at 52523.

applicants, beneficial owners, or recipients of a FinCEN ID—in the BO IT System who reported an identifying document that FinCEN reasonably believes was provided by a U.S. person (*e.g.*, U.S. passport, U.S. driver's license)." *Id.*

105. "To accomplish this deletion efficiently, FinCEN anticipates undertaking the project in one sweep of the database, not as a regular, periodic sweep" and "will provide notice to the public on its website when it has completed the deletion process." *Id.*

106. FinCEN also refused to follow notice-and-comment procedures with respect to the data deletion, determining "it inadvisable as well as unnecessary to add to the time and expense of the deletion project by committing to the more elaborate notice and reporting requirements urged by various commenters." *Id.*

107. FinCEN did not identify any statutory authority that would authorize it to delete previously-reported BOI.

108. FinCEN has no statutory authority to delete previously reported BOI.

**V. The Reporting Rule Reversal harms local prosecutors engaged in law enforcement activities, including Plaintiffs.**

109. Plaintiffs are local prosecutors engaged in law enforcement activities that often rely on BOI to effectively investigate and prosecute crime in their respective jurisdictions.

110. The Pima County Attorney's Office handles a wide variety of criminal prosecutions, including prosecutions that involve businesses with opaque ownership structures.

111. The Sinaloa cartel, for example, actively uses anonymous domestic shell companies to buy local real estate and existing cash-intensive businesses such as restaurants, barber shops, parking lots, and nightclubs in Pima County for illegal money laundering operations. Working with local and state investigators, the Pima County Attorney's Office has prosecuted drug, violent crime, asset forfeiture, and fraud cases involving cartel-owned shell companies, and reasonably expects it will prosecute such cases in the future.

112. The Pima County Attorney's Office also has prosecuted organized retail theft cases involving the use of anonymous domestic shell companies to hide illegal proceeds. The Pima County Attorney reasonably expects her office will prosecute such cases involving anonymous domestic shell companies in the future.

113. The Hennepin County Attorney's Office likewise prosecutes a variety of criminal cases that involve businesses with opaque ownership structures. The Hennepin County Attorney's Office has a dedicated Complex Crimes unit to prosecute financial crimes including theft of public funds, tax evasion, wage theft, corporate embezzlement, and other economic crimes where perpetrators use shell companies to commit theft. The Hennepin County Attorney reasonably expects her office will work with investigators to prosecute cases involving anonymous domestic shell companies in the future.

114. Wage theft is also a priority for the Hennepin County Attorney. She has established a unit to specialize in prosecuting those cases as well as assisting law enforcement in its wage theft investigations. This work often requires unraveling numerous layers of corporate ownership records to determine what individual or business entity should be held accountable for wage theft. BOI is instrumental in making this determination.

115. In order for Plaintiffs to successfully prosecute many of their cases involving anonymous domestic shell companies and front businesses, investigators must uncover BOI.

116. In cases where organized crime groups use domestic shell companies to conceal illegal activities, Plaintiffs often cannot identify and prosecute the individuals actually in charge of the criminal scheme. Even when Plaintiffs are able to identify and prosecute certain individuals in a group who have committed a crime, other individuals in the organization who are involved in directing the criminal activity are able to evade detection because investigators cannot uncover the BOI of the shell companies involved.

117. Under the CTA, Congress sought to make it easier for these local prosecutors and their investigators to obtain BOI to investigate and prosecute criminal activity. Plaintiffs' offices are entitled to BOI with appropriate authorization under 31 U.S.C. § 5336(c)(2)(B).

118. Absent the Reporting Rule Reversal, Plaintiffs and their investigators would be able to obtain BOI for domestic companies and for U.S. beneficial owners of foreign companies from FinCEN by providing the written certification required under 31 C.F.R. § 1010.955(d)(1)(ii)(B)(2).

119. However, because of the Reporting Rule Reversal, investigators must use more resource-intensive methods to reconstruct the beneficial ownership of companies under investigation, including search warrants, subpoenas, interviews, and other investigative tools.

120. For instance, to obtain BOI from the banks where shell corporations hold their funds, investigators send subpoenas to all major banking institutions in the state to identify where a shell corporation has an account. This method is inefficient, and investigators are not always able to find a shell corporation's accounts.

121. Such methods are less efficient and less effective than obtaining BOI from FinCEN. Obtaining a subpoena or search warrant is time consuming and often uncovers only minimal, and sometimes inaccurate, BOI. Moreover, these tactics may tip off the criminals under investigation, prompting them to destroy evidence or adapt their criminal behavior. That is precisely why Congress adopted the CTA's uniform BOI reporting requirement in the first place.

122. Plaintiffs are now harmed by the exemptions and data deletion set forth in the Reporting Rule Reversal, which force Plaintiffs to revert to using less efficient, and often ineffective, pre-CTA investigative methods to uncover BOI that should have been collected and maintained by FinCEN. The Reporting Rule Reversal further harms Plaintiffs by denying

them access to BOI that the CTA requires FinCEN to disclose to them. *See Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016).

## CLAIMS FOR RELIEF

### COUNT ONE
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)
### Contrary to Law and In Excess of Statutory Authority – Reporting Rule Reversal
### (Against Treasury Defendants)

123. Plaintiffs reallege and incorporate all preceding paragraphs.

124. The Treasury Department is an "agency" within the meaning of 5 U.S.C. § 551(1).

125. The Treasury Department's August 14, 2026 Reporting Rule Reversal constitutes final agency action subject to judicial review under 5 U.S.C. §§ 702, 704, and 706.

126. Under the Administrative Procedure Act ("APA"), courts must set aside final agency action that is found to be "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

127. When reviewing whether an agency's action comports with its statutory authority, "courts must exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). Where a statute "delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Id.* at 395. A court cannot accept "the agency's policy judgments . . . if they seem wholly unsupported or if they conflict with the policy judgments that undergird the statutory scheme." *Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 416 (D.C. Cir. 1994); *see also Brown & Williamson Tobacco Corp. v. FDA*, 153 F.3d 155, 176 (4th Cir. 1998), *aff'd*, 529 U.S. 120 (2000) (explaining that "federal agencies" cannot "substitute their policy judgments for those of Congress").

**A. Domestic reporting company exemption.**

128. The Reporting Rule Reversal's exemption for all domestic reporting companies from BOI reporting obligations under the CTA violates both 5 U.S.C. § 706(2)(A) and (C). The exemption conflicts with the express statutory provisions of the CTA, undermines the statutory scheme established by Congress, and is beyond the scope of the Secretary's authority under 31 U.S.C. § 5336(a)(11)(B)(xxiv).

129. The overall objective of the CTA is to enhance financial transparency and make it more difficult for bad actors to conceal their illicit financial activities. *See* 31 U.S.C. § 5311.

130. Congress identified the lack of BOI reporting from domestic companies as a potential threat to U.S. interests, and sought to remedy that threat by requiring at least some domestic companies to report BOI under the CTA.

131. As Congress wrote into the statute, "more than 2,000,000 corporations and limited liability companies are being formed **under the laws of the States** each year"; "**most or all States**" do not require BOI from domestic entities at the time of formation; and, as a result, "malign actors seek to conceal their ownership of . . . **entities in the United States** to facilitate illicit activity, including money laundering, the financing of terrorism, proliferation financing, serious tax fraud, human and drug trafficking, counterfeiting, piracy, securities fraud, financial fraud, and acts of foreign corruption, harming the national security interests of the United States and allies of the United States[.]" *See* NDAA §§ 6402(1), (2), (3) (emphases added).

132. Congress explicitly concluded that "Federal legislation providing for the collection of beneficial ownership information for corporations, limited liability companies, or other similar entities **formed under the laws of the States** is needed" in order to "protect vital United States national security interests," "protect interstate and foreign commerce," "better enable critical national security, intelligence, and law enforcement efforts" to combat crime,

and to "bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards" (*i.e.*, the FATF standards, which explicitly require procedures that ensure that public authorities can access accurate, adequate, and up-to-date BOI for domestic legal entities). *Id.* § 6402(5) (emphasis added).

133. The text of the CTA expressly contemplates that at least some domestic companies will have BOI reporting obligations under the statute:

a. The definition of "reporting company" explicitly includes domestic entities "created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe." 31 U.S.C. § 5336(a)(11)(A)(i); and

b. As a condition of funding under the statute, states must periodically "notify filers of their requirements as reporting companies" and "provide the filers with a copy of the reporting company form[.]" *Id.* § 5336(d)(2)(A)(i).

134. The Secretary's exemption of *all* domestic companies from BOI reporting requirements under Section 5336(a)(11)(B)(xxiv) therefore conflicts with these express statutory provisions and undermines the larger statutory scheme established by Congress.

135. It is also beyond the scope of the Secretary's authority under Section 5336(a)(11)(B)(xxiv).

136. In order to ensure robust BOI reporting, Congress carefully circumscribed twenty-three specific and narrow categories of entities that are exempt from the CTA's definition of "reporting company." *Id.* § 5336(a)(11)(B)(i)–(xxiii).

137. The Secretary's exemption authority under Section 5336(a)(11)(B)(xxiv) follows that specific and narrow list of exemptions, and therefore only allows for similarly specific and narrow exemptions. *See NASDAQ Stock Mkt., LLC v. Securities and Exchange Comm'n*, 961 F.3d 421, 428 (D.C. Cir. 2020) ("Under the principle of *ejusdem generis*, 'where

general words follow an enumeration of specific items, the general words are read as applying only to other items akin to those specifically enumerated.'" (quoting *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 588 (1980))); *see also id.* ("under the canon of *noscitur a sociis*, 'a word is given more precise content by the neighboring words with which it is associated[.]'" (quoting *United States v. Williams*, 553 U.S. 285, 294 (2008))).

138. The Reporting Rule Reversal's exemption of *all* domestic entities from the definition of "reporting company" is not specific and narrow. It renders most of the deliberate statutory exceptions in Section 5336(a)(11)(B) entirely superfluous, swallowing those exemptions whole.

139. The Secretary contends that he must rely on the directive in 31 U.S.C. § 5336(b)(1)(F)(iii) to "minimize burdens on reporting companies" when making an exemption determination under Section 5336(a)(11)(B)(xxiv). *See* 91 Fed. Reg. at 52510.

140. But, on its face, Section 5336(a)(11)(B)(xxiv) does not authorize the Secretary to create a new exemption to "minimize burdens on reporting companies." Under Section 5336(a)(11)(B)(xxiv), the Secretary may only exempt entities from reporting requirements based upon a determination that the information collected: (1) "would not serve the public interest"; *and* (2) "would not be highly useful in national security, intelligence, and law enforcement agency efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, proliferation finance, serious tax fraud, or other crimes."

141. Further, the directive in Section 5336(b)(1)(F)(iii) explicitly applies only to those burdens "associated with the *collection of the information*" required in a BOI report. *See* 31 U.S.C. §§ 5336(b)(1)(F)(iii), (b)(2). Section 5336(b)(1)(F)(iii) plainly concerns minimizing burdens associated with the *process* of reporting, not the threshold question of *who* must report.

142. For all these reasons, the Secretary has acted contrary to law and in excess of his discretion under the CTA.

**B. Exemption for foreign company reporting of U.S. beneficial owners.**

143. The Reporting Rule Reversal's exemption for foreign reporting companies from the requirement to report any U.S. persons who are their beneficial owners also conflicts with express statutory provisions, undermines the statutory scheme established by Congress, and is beyond the scope of the Secretary's authority under § 5318(a)(7), in violation of both 5 U.S.C. § 706(2)(A) and (C).

144. The overall objective of the CTA is to enhance financial transparency and make it more difficult for bad actors to conceal their illicit financial activities. *See* 31 U.S.C. § 5311.

145. The purpose of Section 5336 of the CTA is to specifically require "beneficial ownership information reporting."

146. Section 5336 unambiguously requires each "applicable reporting company" to "identify each beneficial owner" by name, date of birth, and address. 31 U.S.C. § 5336(b)(2)(A).

147. The Secretary does not have discretion under Section 5318(a)(7) to exempt an applicable reporting company from the specific statutory mandate to identify each beneficial owner.

148. First, an exemption under Section 5318(a)(7) must be "appropriate." An exemption that conflicts with an express requirement under the CTA is not "appropriate."

149. Second, the specific legislative mandate controls any general administrative exemption power. "[I]t is a commonplace of statutory construction that the specific governs the general[,]" which is "particularly true where, as [here], 'Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions.'" *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) and quoting *Varity Corp. v. Howe*, 516 U.S. 489, 519 (1996)).

150. For all these reasons, as well, the Secretary has acted contrary to law and in excess of his discretion under the CTA.

**C. Data Deletion Policy.**

151. The Data Deletion Policy conflicts with express statutory provisions and is beyond the scope of the Secretary's authority under 31 U.S.C. § 5318(a)(7), in violation of both 5 U.S.C. §§ 706(2)(A) and (C).

152. Under the statute, FinCEN is required to retain reported BOI for at least 5 years after the date on which the reporting company terminates. 31 U.S.C. § 5336(c)(1).

153. There is no exception to this statutory requirement for BOI reported by companies and individuals that are later exempt from reporting requirements.

154. For this reason, the Secretary has further acted contrary to law and in excess of his discretion under the CTA.

155. The Treasury Department's unlawful actions have caused and will continue to cause harm to Plaintiffs.

156. Accordingly, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Reporting Rule Reversal violates 5 U.S.C. §§ 706(2)(A) and (C).

157. Pursuant to 5 U.S.C. § 706, Plaintiffs are entitled to vacatur of the Reporting Rule Reversal, as well as a permanent injunction preventing Defendants from implementing the exemptions and Data Deletion Policy set forth in the Reporting Rule Reversal.

**COUNT TWO**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious Agency Action – Reporting Rule Reversal**
**(Against Treasury Defendants)**

158. Plaintiffs reallege and incorporate all preceding paragraphs.

159. The Treasury Department is an "agency" within the meaning of 5 U.S.C. § 551(1).

160. The Treasury Department's August 14, 2026 Reporting Rule Reversal constitutes final agency action subject to judicial review under 5 U.S.C. §§ 702, 704, and 706.

161. The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

162. Further, FinCEN may only exempt entities from reporting requirements based upon the Treasury Secretary's determination that the information collected: (1) "would not serve the public interest"; *and* (2) "would not be highly useful in national security, intelligence, and law enforcement agency efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, proliferation finance, serious tax fraud, or other crimes" (the "Treasury Determination"). 31 U.S.C. § 5336(a)(11)(B)(xxiv).

163. The Treasury Determination is final agency action because it "mark[s] the consummation of the [Treasury Secretary's] decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations omitted).

164. The Treasury Determination is therefore also subject to judicial review under the APA. *See* 5 U.S.C. § 704.

165. Agency action must be both "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

166. Courts must find agency action to be arbitrary and capricious where the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency

must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Id.* (citation omitted).

167. Agencies must offer "genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.* "And to this end, conclusory statements will not do; an 'agency's statement must be one of *reasoning*.'" *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (quoting *Butte Cnty., Cal. v. Hogen,* 613 F.3d 190, 194 (D.C. Cir. 2010)).

168. Further, an agency may not "depart from a prior policy sub silentio or simply disregard rules that are still on the books"; it must instead "display awareness that it *is* changing position" and provide "good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original). An agency must provide "a more detailed justification than what would suffice for a new policy created on a blank slate" when "its new policy rests upon factual findings that contradict those which underlay its prior policy." *Id.* An "unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (internal citation and quotation marks omitted).

169. "When an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (internal quotation marks and citation omitted). It must also consider "alternatives . . . within the ambit of the existing policy." *Id.*

### A. Reporting Rule Reversal exemptions.

170. The Reporting Rule Reversal's wholesale elimination of reporting requirements for all domestic companies and U.S. beneficial owners of foreign companies is arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A).

171. First, FinCEN fails to offer a reasoned explanation for its departure from the Reporting Rule. FinCEN has not presented any new or contrary evidence that justifies the new exemptions set forth in the Reporting Rule Reversal.

172. Rather, FinCEN's only justification for the new exemptions is based on a "reassessment" of the Reporting Rule as a result of the "change in presidential administrations, which has resulted in a reassessment of the balance struck in the original Reporting Rule between collecting information that is 'highly useful' for law enforcement and minimizing burdens on reporting companies." 91 Fed. Reg. at 52513.

173. Further, the Reporting Rule Reversal is based on the Treasury Determination, which itself is arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A).

174. The Secretary failed to provide a reasoned explanation for why he reversed the previous determination that BOI reporting by domestic reporting companies and U.S. owners would "serve the public interest" and "be highly useful in national security, intelligence, and law enforcement agency efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, proliferation finance, serious tax fraud, or other crimes."

175. The Secretary determined that such reporting is not in the public interest solely because of "the costs of time and money that the BOI requirements would place on law-abiding American small businesses[.]" Reporting Rule Reversal, 91 Fed. Reg. 52508, 52513.

176. The Secretary did not make *any findings at all* regarding the benefits of BOI reporting by domestic reporting companies and U.S. persons.

177. The Secretary further determined that such reporting would not be "highly useful" to national security, intelligence, and law enforcement agencies based only "on a reasonable assumption that the great majority of small businesses are law-abiding and do not pose a risk of money laundering or illicit finance[.]" *Id.* at 52513.

178. But that is beside the point. Because law enforcement cannot know in advance which companies will warrant scrutiny, the value of beneficial-ownership reporting lies in collecting that information before the need for it arises—as FinCEN explained when promulgating the original Reporting Rule. *See* 87 Fed. Reg. at 59509. The same is true throughout the anti-money-laundering regime: most bank customers do not engage in money laundering, but collecting identifying information before any suspicion arises allows that information to be used when an account later becomes relevant to an investigation.

179. In making his determinations, the Secretary failed to consider "important aspects of the problem," including the risks of illicit activity specifically posed by opaque *domestic* reporting companies and the gaps Congress identified in the pre-existing reporting scheme that led Congress to pass the CTA in the first place.

180. The Secretary further failed to consider that the exemptions create a loophole by which foreign actors can simply form domestic entities, or move ownership of a foreign entity to a U.S. person, in order to avoid reporting requirements altogether.

181. The Secretary's determination that BOI reporting does not "serve the public interest" and is not "highly useful" to law enforcement also contradicts data before the Treasury Department that directly correlate a lack of BOI from U.S. companies with a heightened risk of illicit activities that pose a threat to public safety and national security.

182. Further, as set forth above, Congress did not intend for FinCEN to consider the burden to reporting companies when making exemption determinations.

183. The Reporting Rule Reversal also fails to meaningfully consider any narrower exemptions that could address FinCEN's identified concerns about business burden.

184. The Reporting Rule Reversal further fails to account for the reliance interests of state and local law enforcement agencies, including Plaintiffs, who anticipated using the BOI collected by FinCEN to more efficiently and successfully combat financial crime in their jurisdictions.

185. For all these reasons, the exemptions set forth in the Reporting Rule Reversal are arbitrary and capricious.

**B. Data Deletion Policy.**

186. The Data Deletion Policy is arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A).

187. FinCEN's conclusory explanation that the data should be deleted because of "the values of privacy, information security, and the trust of the public" is not reasoned or reasonably explained. 91 Fed. Reg. at 52518.

188. For this further reason, the Reporting Rule Reversal is arbitrary and capricious.

189. The Treasury Department's unlawful actions have caused and will continue to cause harm to Plaintiffs.

190. Accordingly, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Treasury Determination and Reporting Rule Reversal violate 5 U.S.C. § 706(2)(A).

191. Pursuant to 5 U.S.C. § 706, Plaintiffs are entitled to vacatur of the Reporting Rule Reversal, as well as a permanent injunction preventing Defendants from implementing the exemptions and Data Deletion Policy set forth in the Reporting Rule Reversal.

## COUNT THREE
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious Agency Action – DHS Concurrence**
**(Against DHS Secretary Markwayne Mullin, in his official capacity)**

192. Plaintiffs reallege and incorporate all preceding paragraphs.

193. The Treasury Secretary may only exempt additional "class[es] of entities" from reporting obligations under the CTA if the DHS Secretary provides written concurrence that collecting information from such entities: "(I) would not serve the public interest; and (II) would not be highly useful in national security, intelligence, and law enforcement agency efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, proliferation finance, serious tax fraud, or other crimes." 31 U.S.C. § 5336(a)(11)(B)(xxiv).

194. Prior to March 26, 2025, the DHS Secretary provided the Treasury Department with a written concurrence that the reporting of BOI by domestic reporting companies and their beneficial owners "would not serve the public interest" and "would not be highly useful in national security, intelligence, and law enforcement agency efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, proliferation finance, serious tax fraud, or other crimes" (the "DHS Concurrence"). 90 Fed. Reg. at 13691.

195. The DHS Concurrence is final agency action because it "mark[s] the consummation of the [DHS Secretary's] decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations omitted).

196. The DHS Concurrence is therefore subject to judicial review under the APA. *See* 5 U.S.C. § 704.

197. The DHS Concurrence is arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A).

198. There is no explanation in the public record at all—much less a reasoned explanation—for the DHS Concurrence.

199. In making the DHS Concurrence, the DHS Secretary failed to consider "important aspects of the problem," including the risks of illicit activity specifically posed by opaque *domestic* reporting companies and the gaps Congress identified in the pre-existing reporting scheme that led Congress to pass the CTA in the first place.

200. The DHS Concurrence also contradicts facts before the DHS Secretary that directly correlate a lack of beneficial ownership information from U.S. companies with a heightened risk of illicit activities that pose a threat to public safety and national security.

201. For these reasons, the DHS Concurrence is arbitrary and capricious.

202. The DHS Secretary's unlawful actions have caused and will continue to cause harm to Plaintiffs.

203. Accordingly, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the DHS Concurrence violates 5 U.S.C. § 706(2)(A).

204. Because the DHS Concurrence is illegal, the Treasury Secretary cannot rely on it for purposes of 31 U.S.C. § 5336(a)(11)(B)(xxiv) to exempt any entities from their reporting obligations under the CTA.

205. Pursuant to 5 U.S.C. § 706, Plaintiffs are entitled to vacatur of the Reporting Rule Reversal, as well as a permanent injunction preventing Defendants from implementing the exemptions set forth in the Reporting Rule Reversal.

## COUNT FOUR
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious Agency Action – AG Concurrence**
**(Against Attorney General Todd Blanche, in his official capacity)**

206. Plaintiffs reallege and incorporate all preceding paragraphs.

207. The Treasury Secretary may only exempt additional "class[es] of entities" from reporting obligations under the CTA if the Attorney General provides written concurrence that collecting information from such entities: "(I) would not serve the public interest; and (II) would not be highly useful in national security, intelligence, and law enforcement agency

efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, proliferation finance, serious tax fraud, or other crimes." 31 U.S.C. § 5336(a)(11)(B)(xxiv).

208. Prior to March 26, 2025, the Attorney General provided the Treasury Department with a written concurrence that the reporting of BOI by domestic reporting companies and their beneficial owners "would not serve the public interest" and "would not be highly useful in national security, intelligence, and law enforcement agency efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, proliferation finance, serious tax fraud, or other crimes" (the "AG Concurrence"). 90 Fed. Reg. at 13691.

209. The AG Concurrence is final agency action because it "mark[s] the consummation of the [Attorney General's] decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (citations omitted).

210. The AG Concurrence is therefore subject to judicial review under the APA. See 5 U.S.C. § 704.

211. The AG Concurrence is arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A).

212. There is no explanation in the public record at all—much less a reasoned explanation—for the AG Concurrence.

213. In making the AG Concurrence, the Attorney General failed to consider "important aspects of the problem," including the risks of illicit activity specifically posed by opaque *domestic* reporting companies and the gaps Congress identified in the pre-existing reporting scheme that led Congress to pass the CTA in the first place.

214. The AG Concurrence also contradicts facts before the Attorney General that directly correlate a lack of beneficial ownership information from U.S. companies with a heightened risk of illicit activities that pose a threat to public safety and national security.

215. For these reasons, the AG Concurrence is arbitrary and capricious.

216. The Attorney General's unlawful actions have caused and will continue to cause harm to Plaintiffs.

217. Accordingly, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the AG Concurrence violates 5 U.S.C. § 706(2)(A).

218. Because the AG Concurrence is illegal, the Treasury Secretary cannot rely on it for purposes of 31 U.S.C. § 5336(a)(11)(B)(xxiv) to exempt any entities from their reporting obligations under the CTA.

219. Pursuant to 5 U.S.C. § 706, Plaintiffs are entitled to vacatur of the Reporting Rule Reversal, as well as a permanent injunction preventing Defendants from implementing the exemptions set forth in the Reporting Rule Reversal.

## COUNT FIVE
## Administrative Procedure Act, 5 U.S.C. § 706(2)(D)
## Failure to Observe Procedures Required By 5 U.S.C. § 553 – Data Deletion Policy
## (Against Treasury Defendants)

220. Plaintiffs reallege and incorporate all preceding paragraphs.

221. The Treasury Department is an "agency" within the meaning of 5 U.S.C. § 551(1).

222. The Treasury Department's August 14, 2026 Reporting Rule Reversal constitutes final agency action subject to judicial review under 5 U.S.C. §§ 702, 704, and 706.

223. Under the APA, courts must set aside final agency action found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

224. Under 5 U.S.C. § 553, federal agencies must give notice of a proposed rulemaking that includes "either the terms or substance of the proposed rule or a description of the subjects and issues involved" and then "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."

225. Adequate notice requires that a final rule does not differ "too sharply" from the proposed rule. *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C. Cir. 1983). "Where the change between the proposed and final rule is important, the question for the court is whether the final rule is a 'logical outgrowth' of the rulemaking proceeding." *United Steelworkers v. Marshall,* 647 F.2d 1189, 1221 (D.C. Cir. 1980), *cert. denied sub nom. Lead Indus. Ass'n, Inc. v. Donovan,* 453 U.S. 913 (1981). "[I]f the final rule deviates too sharply from the proposal, affected parties will be deprived of notice and an opportunity to respond to the proposal." *Small Refiner*, 705 F.2d at 547.

226. The Interim Final Rule did not mention the Data Deletion Policy. "[I]nterested parties" could not possibly "have anticipated that the [Data Deletion Policy] was possible." *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1080 (D.C. Cir. 2009).

227. The Data Deletion Policy is an important change between the IFR and the Reporting Rule Reversal, and it is not a logical outgrowth of the rulemaking proceeding.

228. Prior to issuing the Reporting Rule Reversal, the Treasury Department did not give notice of or opportunity to comment on the Data Deletion Policy, in violation of 5 U.S.C. § 553.

229. For this reason, the Data Deletion Policy was issued "without observance of procedure required by law" in violation of 5 U.S.C. § 706(2)(D).

230. The Treasury Department's unlawful actions have caused and will continue to cause harm to Plaintiffs.

231. Accordingly, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Data Deletion Policy violates 5 U.S.C. § 706(2)(D).

232. Pursuant to 5 U.S.C. § 706, Plaintiffs are entitled to vacatur of the Data Deletion Policy, as well as a permanent injunction preventing Defendants from implementing the Data Deletion Policy set forth in the Reporting Rule Reversal.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court provide the following relief:

1. Declare that the Reporting Rule Reversal is contrary to law and in excess of statutory authority, in violation of 5 U.S.C. §§ 706(2)(A) and (C);

2. Hold unlawful, set aside, and permanently enjoin the Reporting Rule Reversal under 5 U.S.C. §§ 706(2)(A) and (C);

3. Declare that the Reporting Rule Reversal is arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A);

4. Hold unlawful, set aside, and permanently enjoin the Reporting Rule Reversal under 5 U.S.C. § 706(2)(A);

5. Declare that the Treasury Determination is arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A);

6. Declare that the DHS Concurrence is arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A);

7. Declare that the AG Concurrence is arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A);

8. Declare that the Data Deletion Policy was issued "without observance of procedure required by law" in violation of 5 U.S.C. § 706(2)(D);

9. Stay implementation of or otherwise enjoin the Data Deletion Policy under 5 U.S.C. § 705 and hold unlawful, set aside, and permanently enjoin the Data Deletion Policy under 5 U.S.C. § 706(2)(D);

10. Award reasonable attorneys' fees and costs pursuant to any applicable law; and

11. Award any additional relief as the interests of justice require.

Dated: November 20, 2026

Respectfully submitted,

/s/ *Emily D. Gilman*
Emily D. Gilman
D.C. Bar No. 1740641
Brendan Ballou
D.C. Bar No. 241592
**Public Integrity Project**
1763 Columbia Road NW, Suite 175
Washington, DC 20009
(917) 684-3900
emily@publicintegrityproject.org

brendan@publicintegrityproject.org

*Attorneys for Plaintiffs Laura Conover, in her official capacity as Pima County Attorney, and Mary Moriarty, in her official capacity as Hennepin County Attorney*